Entered on Docket
**December 31, 2008**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**IT IS SO ORDERED.**
**Signed December 31, 2008**

Arthur S. Weissbrodt
**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                          ] Case No. 04-56255
                                               ]
    Frank Bertuccio,                           ] Chapter 13
                                               ]
                    Debtor.                    ]
_____]
Frank Bertuccio,                               ] Adversary No. 04-5524
                                               ]
                    Plaintiff,                 ]
                                               ]
vs.                                            ]
                                               ]
California State Contractors                   ]
License Board, et al.                          ]
                                               ]
                    Defendants.                ]
_____]

**DECISION IN PART ON DEBTOR'S ACTION FOR DAMAGES FOR**
**VIOLATION OF THE AUTOMATIC STAY**

    On November 11, 2004, Debtor Frank Bertuccio ("Debtor") filed a

Complaint for Preliminary Injunction and Declaratory Relief

("Complaint") against Defendants California State Contractors

License Board ("CSLB"), the California State Employment Development

Department ("EDD"), Stephen P. Sands as the Registrar of the CSLB

("Sands") and Sally McKeag as the Chief Deputy Director of the EDD

*Note:* The left margin contains the vertical text: "UNITED STATES BANKRUPTCY COURT For The Northern District Of California"

1  ("McKeag")(collectively, "Defendants"). The Complaint alleges that

2  the Defendants willfully violated the automatic stay by failing to

3  timely reinstate the Debtor's contractor's license upon notice of

4  his bankruptcy filing. The Debtor seeks actual and exemplary

5  damages against the Defendants pursuant to Bankruptcy Code

6  § 362(h).[1]

7      Debtor is represented by Cathleen Cooper Moran, Esq. of the

8  Moran Law Group. Defendants Sands and the CSLB (hereinafter,

9  collectively, the "CSLB" unless otherwise specified) are

10 represented by Maretta D. Ward, Esq., Deputy Attorney General for

11 the State of California. Defendants McKeag and the EDD

12 (hereinafter, collectively the "EDD" unless otherwise specified)

13 are represented by Marguerite C. Stricklin, Esq., Deputy Attorney

14 General for the State of California.

15     This Memorandum Decision constitutes the Court's findings of

16 fact and conclusions of law, pursuant to Rule 7052 fo the Federal

17 Rules of Bankruptcy Procedure ("Bankruptcy Rules").

18

19                          I.

20             FACTUAL AND PROCEDURAL BACKGROUND

21     On or about October 14, 1994, the Debtor applied with the CSLB

22 for a flooring and floor covering contractor's license.[2] On

23

24     [1]  Unless otherwise provided, all references to code sections
    shall mean the Bankruptcy Code, codified in Title 11 of the United
25  States Code, 11 U.S.C. § 101, et seq., including all amendments
    thereto, as applicable at the time this Adversary Proceeding was
26  filed on November 1, 2004.

27     [2]  Trial Exhibit U. The exhibits admitted at trial were
    submitted by the parties on a joint basis. The parties stipulated
28

March 30, 1995, the CSLB issued a contractor's license to the
Debtor, as a sole owner business, under the business name of
European Hardwood Floors Design & Interiors.[3]  Between May 2, 2000[4]
and April 23, 2003, the Debtor changed the name of his business in
the records of the CSLB three times.[5]

---

on the record to the admission of Trial Exhibits A-V.

[3]  Trial Exhibits A, N and O.

[4]  On May 2, 2000, the Debtor changed the name of his
business, in the records of the CSLB, to "Statewide Professional
Services/European Hardwood Floors."  Statewide Professional
Services, Inc. was later incorporated by the Debtor on
September 6, 2001 ("Statewide").  Trial Exhibit B.  Statewide's
corporate status was suspended on July 21, 2004.  Id.
     On November 7, 2005 -- roughly one month after the Debtor
filed his Chapter 13 petition and a few days after the filing of
this Adversary Proceeding -- Statewide filed its own Chapter 7
petition.  The Debtor signed Statewide's petition as its President
and authorized agent.  Statewide's schedules indicate that the
Debtor's "new corporation" "European Floor Coverings" purchased
most of Statewide's assets.  Statewide's Schedule E lists a
$37,514.00 debt owing to the EDD.  No proof of claim was filed by
the EDD in Statewide's case.  Statewide's Schedule E showed total
unsecured priority debts of $131,983.00.  Statewide had no secured
debts and only $72,156.36 in general unsecured debts.  Statewide's
Statement of Financial Affairs indicates that the EDD seized
approximately $68,000 from Statewide's accounts between 2002 and
2005.  A Final Decree was entered in Statewide's bankruptcy case on
February 21, 2006.
     In the Debtor's instant bankruptcy case, the EDD filed a claim
in total amount of $12,385,34 for the tax period from April 1, 2001
through September 30, 2001, asserting a priority as to $11,797.22
of that amount.  Trial Exhibit J.  The tax period covered by this
claim was prior to the incorporation of Statewide by the Debtor on
September 6, 2001, and, therefore, presumably while the Debtor was
operating his business as a "sole owner."

[5]  EDD's Closing Post Trial Brief, Attachment 1.  This
attachment is the May 1, 2008 Decision by the CSLB (the "CSLB
Decision").  The CSLB Decision references and attaches the
April 14, 2008 Proposed Decision by Administrative Law Judge
Melissa G. Crowell (the "Proposed Decision").  A complete copy of
the CSLB Decision, with the attached Proposed Decision, is attached

On April 10, 2003, the Debtor signed an application with the CSLB to change the business' status to a corporation with the name of European Hardwood Floors Design and Interiors.[6] It is unclear, from the evidence currently before this Court, whether this April 2003 application was ever granted.[7] The California Secretary of State has no record of any corporation named European Hardwood Floors Design and Interiors.

On June 25, 2003, the EDD advised the CSLB that the Debtor was in violation of state law for failing to pay taxes in the amount of $34,517.46.[8] This tax liability is based on an uncontested audit by the EDD, for the period beginning January 1, 1999 through

---

as Attachment 1 to EDD's Closing Post Trial Brief. A complete copy of the CSLB Decision, with the attached Proposed Decision, is also included as Exhibit B to the Chamber's Copy of the Request for Judicial Notice Pursuant to 28 U.S.C. Section 201, filed by the CSLB on June 25, 2008 (the "Request for Judicial Notice"). However, the electronically-filed version of the Request for Judicial Notice posted on the Court's docket does not include the Proposed Decision. Assuming that the copy served on the parties included the Proposed Decision, counsel for the CSLB should correct the version posted on the Court's website to also attach the Proposed Decision. For the sake of clarity in the meantime, when referencing the CSLB Decision, the Court will cite to Attachment 1 of EDD's Closing Post Trial Brief since the electronically-filed version of this document includes the Proposed Decision.

[6] EDD's Closing Post Trial Brief, Attachment 1.

[7] Staci Pugh of the CSLB testified at trial that this application was "returned because we needed additional information regarding corporate titles and because the EDD liability needed to be complied with." Trial Transcript, Vol. II, 37:9-11. However, the Proposed Decision issued by Administrative Law Judge Melissa G. Crowell indicates that on April 23, 2003, the CSLB granted this application for a corporate license. EDD's Closing Post Trial Brief, Attachment 1.

[8] Trial Exhibit E.

1   September 30, 2001.[9]  On June 26, 2003, the CSLB sent a letter to

2   the Debtor advising him of his default with the EDD and the

3   potential suspension of his license if the default was not

4   corrected.[10]  On August 26, 2003, the CSLB suspended the Debtor's

5   contractor's license for failing to resolve the outstanding 2001

6   tax liability owing to the EDD, in accordance with California

7   Business and Professions Code § 7145.5.[11]

8        While his contractor's license was suspended, the Debtor

9   continued to operate his business.  At trial, the Debtor insisted

10  that he only continued that portion of his business related to the

11  sale of flooring materials, for which the Debtor contends a

12  contractor's license was not needed.[12]  The evidence shows, however,

13  that in early October 2004, while the Debtor's contractor's license

14  was suspended, he entered into contracts for the installation of

---

[9]   Trial Transcript, Vol. I., 45:12-24 and Trial Exhibits C
and D.

[10]   Trial Exhibit E.

[11]   Trial Exhibit F.

[12]   Trial Transcript, Vol. I., 12:13-22.  The Debtor testified
at trial that 20-30% of his business was attributable to the sale
of flooring material without associated installation.  Trial
Transcript, Vol. I., 20:3-6.  The Debtor further testified at trial
that, just prior to the suspension of his contractor's license in
the Summer of 2003, the installation portion of his business
realized about $50,000/month in gross sales.  Trial Transcript,
Vol. I, 21:3-5.  Of this gross amount, the cost to the Debtor for
the labor and materials was approximately $10,000.  Trial
Transcript, Vol. I, 21:10-12, 23:5-8.  Prior to the suspension of
his contractor's license, the Debtor grossed roughly $10,000-
$15,000/month from material sales.  Trial Transcript, Vol. I.,
25:10-12.

1   hardwood flooring with at least two parties.[13]  The Debtor testified

2   that he entered into the contracts in question believing that his

3   contractor's license would be reinstated -- in light of his Chapter

4   13 bankruptcy filing -- in sufficient time to perform the

5   installations called for in the contracts.[14]

6       The contracts in question were initially brought into evidence

7   by the Debtor as evidence of the alleged damages he sustained as a

8   result of the Defendants' failure to timely reinstate his

9   contractor's license.[15]  As further evidence of the damage he

10  incurred from not having his contractor's licence, at trial the

11  Debtor submitted copies of his business' phone log of calls from

12  potential customers between October 8, 2004 and October 30, 2004.[16]

13      On October 7, 2004, the Debtor filed a Chapter 13 bankruptcy

14  petition.  On October 8, 2004, the Debtor's counsel provided actual

15  notice to the CSLB of the Debtor's bankruptcy filing via facsimile

16  and asked that the Debtor's license be reinstated.[17]  On

17  October 14, 2008, the CSLB relayed this information to the EDD.[18]

18  The EDD declined the request by the CSLB for permission to lift the

19  suspension of the Debtor's contractor's license.[19]  On

20

21      [13]  Trial Exhibits P, Q and R.

22      [14]  Trial Transcript, Vol. I, 27:7-28:5.

23      [15]  Declaration of Frank Bertuccio in Support of Motion for
    Preliminary Injunction, filed by the Debtor on November 9, 2004.
24

25      [16]  Trial Exhibit M.

26      [17]  Trial Exhibit T.

27      [18]  Trial Exhibit G.

28      [19]  Trial Exhibit G.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

October 18, 2004, the Debtor's counsel called the EDD directly and
again requested a release of the Debtor's license.  In response,
the EDD's representative asked if the Debtor's Chapter 13 plan
required the use of his contractor's license.[20]  The EDD has argued
that "[s]ince the debtor had continuously received earnings during
the period his contractor's license was suspended, it was not clear
to EDD that the debtor needed the license to fund the plan."[21]  On

---

[20]  Trial Exhibit G.

[21]  Trial Brief in Opposition to Debtor's Amended Motion for
Damages and Attorney's Fees, filed by the EDD on January 28, 2008,
2:21-23.  See also, Deposition of Morris Hampton of the EDD,
admitted into evidence at trial by stipulation of the parties, at
26:17-27:25:

[Morris Hampton answering]

A.    It was another request for reinstatement of the
      license.

[Attorney Cathleen Cooper Moran questioning]

Q.    What did you do?

A.    I believe I contacted your office and tried to
      ascertain some information on the nature of how the
      plan was going to be funded because there wasn't a
      plan at that time.  And I didn't know what was
      different in what I was seeing than what had been
      present in the past.

Q.    What relevance did you believe that had, that
      information you were seeking had to the decision to
      reinstate the license or not to reinstate the
      license?

A.    To our knowledge, the debtor was in a situation
      where he was earning wages and could fund it other
      than with the Contractors License.

      . . .

DECISION IN PART ON DEBTOR'S ACTION FOR
DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY

7

October 22, 2004, the EDD received a copy of the Debtor's Chapter 13 plan from the Debtor's counsel, as requested.[22]

On November 1, 2004, the Debtor's attorney called to advise the CSLB that she would be filing a motion seeking an injunction and would fax those documents to the CSLB.[23]  The CSLB received this fax and forwarded it to the EDD.[24]  After this fax was sent to the EDD, the CSLB received an email from the EDD's representative authorizing the release of the license.[25]  The CSLB released the Debtor's contractor's license that same day.[26]

---

Q.   My question is: What information did you think you
     needed to have in order to recommend reinstatement
     of the license?

A.   Why did he need the license?

Q.   You thought that was the central issue to whether
     the license ought to be reinstated or not?

A.   Based on the fact that he was earning wages to fund
     a plan, yes.

Q.   So was it your thought then that if he was earning
     wages he didn't need a license?

A.   He was consistently earning wages at the same place.

Q.   And therefore what?

A.   What was different in needing the license that he
     hadn't had for almost a year and a half.

[22] Deposition of Morris Hampton at 32:5-7.

[23] Trial Transcript, Vol. II, 25:12-17; Trial Exhibit G.

[24] Trial Transcript, Vol. II, at 27:1-3.

[25] Id. at 27:5-8.

[26] Id. at 27:12-13.

On November 1, 2004, the Debtor commenced this Adversary Proceeding by filing the Complaint. On November 3, 2004, a hearing was held on the Debtor's motion for a temporary restraining order and preliminary injunction against the Defendants. Not aware that the Debtor's contractor's license had been reinstated just two days before, on November 1, 2004[27], the Court issued a Preliminary Injunction through December 9, 2004, requiring the immediate reinstatement of the Debtor's contractor's license. At the January 27, 2004 continued hearing of this matter, the Debtor's request for a preliminary injunction was denied as moot.

On December 16, 2004, the Debtor filed a motion for damages for violation of the automatic stay (the "Motion for Damages").

Roughly nine months after the filing of his Chapter 13 bankruptcy, on July 8, 2005, the Debtor formed a California corporation named European Floor Coverings, Inc.[28] About seven months later, on February 14, 2006, the Debtor filed an application with the CSLB for a corporate license under the name European Floor Coverings, Inc.[29] The Debtor testified at trial that this second application was not granted because his contractor's license was

---

[27] On November 1, 2004, the CSLB was instructed by the EDD that the suspension of the Debtor's license could be lifted. Trial Exhibit I. The CSLB lifted the license suspension on November 1, 2004. On November 2, 2004, the CSLB sent a letter to the Debtor indicating his license had been reinstated effective November 1, 2004. Trial Exhibit K. Also on November 2, 2004, Staci Pugh of the CSLB called the Debtor's counsel to advise her of the reinstatement and left a message. Trial Transcript, Vol. II, 52:14-53:1.

[28] Trial Exhibits D and S.

[29] Trial Exhibit V.

suspended.[30]  However, evidence presented by the CSLB at trial shows this application was denied for other reasons, which would become very significant after the trial.  In considering this application, the CSLB asked for additional information regarding the Debtor's criminal history.  The Debtor failed to respond to this request for information and the "application went void for failure to comply."[31] Evidence presented at trial shows that the Debtor was using the business name "European Floor Coverings" as early as October 2004.[32]

Trial on this matter was held on February 13 and 15, 2008.  The CSLB has alleged that, in the course of the trial, it learned for the first time that the Debtor had lied on his original application for a contractor's license, as well as on his subsequent applications for corporate contractor's licenses.[33]  Specifically,

---

[30]  Trial Transcript, Vol. I., 57:18-24.

[31]  Trial Transcript, Vol. II, 39:14-40:1.  The Debtor testified at trial that the CSLB requested a copy of his "rap sheet" as part of his application for a corporate license.  Trial Transcript, Vol. II, 99:3-4.  The Debtor testified that this rap sheet was provided to the CSLB three times, but because it was not provided by the Debtor in the correct format and in a timely matter, the application was void and he would have to reapply. Trial Transcript, Vol. II., 95:23-96:1, 103:5-10.

[32]  Trial Exhibit M and Trial Transcript, Vol. I., 57:7-13.

[33]  Defendant Contractors' State License Board Post-Trial Brief, filed June 25, 2008, at 2:2-5 states: "During cross-examination on a mundane matter, Plaintiff Bertuccio made an untruthful statement.  When that statement was investigated further, it was discovered that Plaintiff Bertuccio had fraudulently obtained the contracting license on which he was attempting to sue CSLB."
See also Defendant Contractors State License Board and Registrar Stephen P. Sands Post Trial Brief ("CSLB's Post Trial Brief"), filed May 30, 2008, at 6:13-14.  The CSLB has argued in its Post Trial Brief that the Debtor "has committed multiple acts of bankruptcy fraud against this Court from filing and pursuing

the Debtor failed to disclose several prior criminal convictions. Trial Transcript, Vol. II, p.60:14-63:4. The CSLB insisted that the Debtor "had multiple convictions for serious crimes and acts for which CSLB will routinely not issue a license."[34]

On April 11, 2008, a hearing was held before the CSLB regarding the revocation of the Debtor's contractor's license.[35] On April 16, 2008, Administrative Law Judge Melissa G. Crowell issued a proposed decision to revoke the Debtor's contractor's license in light of his repeated failure to disclose his criminal record, as well as his entry into contracts for the installation of flooring while his license was suspended.[36] On May 1, 2008, the CSLB issued a decision

this matter to knowing that he had essentially stolen the license at issue, to each of the documents he filed in relation to his claim." CSLB's Post Trial Brief at 12:3-5. The CSLB has also asked that the Debtor's attorney, Cathleen Moran, be sanctioned for "prosecuting an action on an illegal contract and participating in bankruptcy fraud." CSLB's Post Trial Brief at 17:11. CSLB also "preserves all of its rights to pursue state and federal criminal charges against Plaintiff that were discovered during this case even though not listed on Defendant's Answer." CSLB's Post Trial Brief at 13, n. 8.

[34] CSLB's Post Trial Brief at 4:17-18. At trial, Staci Pugh testified that, in her 26½ years of experience of working for the CSLB, she had never known the CSLB to issue a license to an applicant with Plaintiff's criminal history. Trial Transcript, Vol. II, 43:12-17. Ms. Pugh is currently a Programmer II with the CSLB. Id. at 9:16. Between 1995 and 2006, Ms. Pugh worked in the Judgment Unit of the CSLB, where she was responsible for first suspending the Debtor's license and then lifting that suspension at the direction of the EDD. Id. at 13:8-27:13.

[35] EDD's Closing Post Trial Brief, filed May 30, 2008, Attachment 1.

[36] Id.

adopting the proposed decision of Judge Crowell.[37]  On June 2, 2008, the decision of the CSLB became final and the Debtor's contractor's license was again revoked, this time with a one year bar for reapplying for a reissuance or reinstatement.[38]

## II.

### ANALYSIS

In both his Complaint and his Motion for Damages, the Debtor has alleged that the Defendants willfully violated the automatic stay by failing to timely reinstate his contractor's license upon notice of his bankruptcy filing.  The Debtor seeks actual and exemplary damages against the Defendants pursuant to Bankruptcy Code § 362(h).[39]  Section 362(h) creates a statutory remedy for individual debtors who are injured by a violation of the automatic stay.  It provides:

> (h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h).  A party seeking damages for violation of the

---

[37]  Request for Judicial Notice Pursuant to 28 U.S.C. Section 201, filed by CSLB on 6/25/08, Exhibit B.

[38]  Id.

[39]  Bankruptcy Code § 362 was substantially amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA").  Upon the enactment of the BAPCPA, what had been 362(h) became 362(k)(1).  In addition, the BAPCPA added 362(k)(2), which now limits recovery to the actual damages sustained if the violating entity's actions were in good faith.  However, this Adversary Proceeding was filed prior to the enactment of the BAPCPA, therefore, as also noted at footnote 1, the code sections referenced herein shall refer to the Bankruptcy Code as it was in effect at the time of the filing of this Adversary Proceeding.

1   automatic stay must prove by a preponderance of the evidence that

2   (1) a bankruptcy petition was filed; (2) the debtor is an

3   individual; (3) the creditor received notice of the petition;

4   (4) the creditor's actions were in willful violation of the stay;

5   and (5) the debtor suffered damages.  <u>In re Henry</u>, 328 B.R. 664,

6   667 (Bankr. E.D.N.Y. 2005)(citations omitted).

7       The parties agree as to the underlying facts in this case and,

8   therefore, the first three elements of this cause of action are

9   easily met.  The Debtor filed a Chapter 13 petition on

10  October 7, 2004.  On October 8, 2004, the Debtor's counsel provided

11  actual notice of the filing to the CSLB via facsimile and asked

12  that the Debtor's license be reinstated.[40]  On October 14, 2004, the

13  CSLB relayed this information to the EDD.  A subsequent request for

14  reinstatement was made by the Debtor's counsel to the EDD and

15  further exchanges occurred.  The Debtor's license was not

16  reinstated until November 1, 2004, when the EDD finally authorized

17  the CSLB to do so.  Therefore, a total of twenty-four days elapsed

18  between the date upon which the CSLB was given actual notice and

19  the reinstatement of the Debtor's license.  The CSLB had notice of

20

21      [40]  The official notice of the bankruptcy filing was not mailed
    by the Court until October 28, 2004.  However, it is common for key
22  creditors to receive actual notice of the filing prior to the
    issuance of the notice from the Court.  "Such 'informal' notice
23  . . . can constitute notice sufficient for a finding of
    willfulness."  March, Ahart & Tchaikovksy, CAL. PRAC. GUIDE:
24  BANKRUPTCY (The Rutter Group 2007) at ¶ 8:880, <u>citing</u> <u>In re Abrams</u>,
    127 B.R. 239, 240-244 (9th Cir. BAP 1991)(creditor who repossessed
25  debtor's vehicle postpetition, without knowledge of the bankruptcy
    filing, willfully violated stay by refusing to return vehicle after
26  being notified of debtor's bankruptcy by fax from debtor's
    attorney); <u>In re Knaus</u>, 889 F.2d 773, 775 (8th Cir. 1989)(creditor's
27  failure to return property lawfully taken prepetition after
    bankruptcy notification and demand from debtor constituted willful
28  violation of stay).

1  the Debtor's bankruptcy for six days before relaying that

2  information to the EDD to request permission to reinstate the

3  license.  Then, an additional eighteen days elapsed between the

4  time the EDD received notice and the reinstatement of the Debtor's

5  license.  It also appears from the evidence presented that the

6  license was reinstated on November 1, 2004 in response to the

7  Debtor's Complaint, which was faxed to the Defendants and filed

8  that same day.[41]

9      The disagreements between the parties relate to the final two

10 elements of this cause action -- the Defendants' alleged willful

11 violation of the stay and the alleged damages suffered by the

12 Debtor.  The Court must, therefore, decide two separate issues to

13 resolve this matter.  First, did the Defendants willfully violate

14 the automatic stay by failing to reinstate promptly the Debtor's

15 contractor's license postpetition?  Second, if so, what are the

16 Debtor's actual damages for such violation?

17

18 **A.  Willful Violation**

19     On the issue of whether a violation of the automatic stay is

20 "willful," the Ninth Circuit Bankruptcy Appellate Panel has held:

21          An award of actual damages under § 362(h) requires a
            showing by the debtor that she sustained an injury from a
22          "willful" violation of the stay.  A "willful violation"
            does not require specific intent to violate the automatic
23          stay.  A violation of the automatic stay is "willful" if
            1) the creditor knew of the stay and 2) the creditor's
24          actions, which violated the automatic stay, were
            intentional.

25

26 In re Roman, 283 B.R. 1, 7-8 (9th Cir. BAP 2002) (internal citations

27 _____

28          [41]  Deposition of Morris Hampton at 36:11-37:11.

omitted). <u>Accord</u>, <u>In Re Pace</u>, 67 F.3d 187, 191 (9th Cir. 1995); <u>In Re Bloom</u>, 875 F.2d 224, 227 (9th Cir. 1989); <u>In re Abrams</u>, 127 B.R. 239, 243 (9th Cir. BAP 1991).

> Once a creditor knows that the automatic stay exists, the creditor bears the risk of all intentional acts that violate the automatic stay regardless of whether the creditor means to violate the automatic stay.

<u>In re Campion</u>, 294 B.R. 313, 318 (9th Cir. BAP 2003).

The parties agree that the prepetition suspension of the Debtor's contractor's license was not a violation of any stay. There is also no dispute that, after being notified of the Debtor's bankruptcy filing, the CSLB and the EDD failed to reinstate the license for twenty-four days. The issue is whether the delay in the reinstatement of the license constitutes a willful violation of the automatic stay.

The applicable provision of Bankruptcy Code § 362(a)(1) provides as follows:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

11 U.S.C § 362(a)(1).

The Debtor notes that 362(a)(1) specifically prohibits the continuation of an administrative proceeding pending against the Debtor that was commenced prepetition. The Debtor contends that the suspension of his contractor's license constitutes such an

1  administrative proceeding.  In response to the Debtor's arguments

2  that the Defendants willfully violated the automatic stay, the

3  Defendants raise several defenses.  First, the Defendants argue

4  that no violation occurred since they took no affirmative act after

5  the commencement of the Debtor's bankruptcy case to collect the

6  debt owed by the Debtor to the EDD.  Second, the Defendants argue

7  that their actions related to the reinstatement of the Debtor's

8  contractor's license are protected under the "police powers"

9  exception of § 362(b)(4).  Third, the EDD argues that the stay was

10 not violated because, under California State law, the Debtor was

11 not entitled to reinstatement of his license until he satisfied his

12 tax obligations.  Fourth, the CSLB argues that it was acting

13 pursuant to state statute and at the direction of the EDD.

14 Finally, related to the Defendants' arguments regarding their

15 statutory authority under California State law, the Defendants

16 argue that it was within their discretion to determine whether a

17 debtor "needs" his contractor's license reinstated to effectuate

18 the debtor's bankruptcy plan.  If the Defendants decided that the

19 Debtor did not "need" his contractor's license to fund his

20 bankruptcy case, then, at least in Defendants' view, they were not

21 required to reinstate the license and their refusal to reinstate

22 the license would not constitute a violation of the automatic stay.

23 The Court will address each of the defenses raised separately.

24

25 1.  Affirmative Act to Collect Debt

26     The EDD argues that its initial decision not to allow the

27 reinstatement of the license was not the functional equivalent of

28 an affirmative act to collect a prepetition claim, which would

1  constitute a stay violation.  The Defendants note that the

2  suspension of the Debtor's license occurred several months

3  prepetition.  Even though the basis of this suspension was the

4  Debtor's non-payment of a debt owed to the EDD, the Defendants

5  argue that their initial refusal to reinstate the Debtor's license

6  upon his bankruptcy filing was not an affirmative act to collect

7  the prepetition debt.  Rather, the Defendants argue they were

8  simply reviewing the Debtor's case to determine if the suspension

9  of his license should be removed.

10      The Debtor counters that the Defendants had an affirmative duty

11  to lift the suspension of the license upon receiving notice of the

12  Debtor's bankruptcy filing.  Eskanos & Adler, P.C. v. Leetien, 309

13  F.3d 1210, 1215 (9th Cir. 2002).  An unjustifiable delay in

14  correcting the creditor's behavior in violation of the automatic

15  stay may warrant the award of sanctions against the creditor.

16  Leetien, 309 F.3d at 1215.  The Debtor alleges that the Defendants

17  violated their affirmative duty by failing to reinstate the

18  Debtor's license for twenty-four days after receiving notice of the

19  bankruptcy filing and the Debtor's request for reinstatement.

20      An affirmative duty to undo actions taken before the imposition

21  of the automatic stay has been recognized by many cases, albeit in

22  slightly different factual contexts than the case at hand.  See In

23  re Del Mission, Ltd. (EDD v. Taxel), 98 F.3d 1147 (9th Cir.

24  1996)(State's continued retention of taxes violated the automatic

25  stay), In re Roberts (FTB v. Roberts), 175 B.R. 339, 343 (9th Cir.

26  BAP 1994)("[A] garnishing creditor has an affirmative duty to stop

27  garnishment proceedings when notified of the automatic stay."), In

28  re Abrams, 127 B.R. 239 (9th Cir. BAP 1991)(creditor that

repossessed a car postpetition without notice of the bankruptcy violated the stay by refusing to turn the car over when notified of the bankruptcy filing). <u>See also</u> <u>In re Henry</u>, 328 B.R. 664 (Bankr. E.D.N.Y. 2005)(law firm violated the stay when the firm failed to release a lien placed prepetition on the debtor's bank account), <u>In re Jessamey</u>, 330 B.R. 80 (Bankr. D. Mass. 2005)(judgment on the pleadings denied since City could violate the automatic stay by failing to release a hold on the debtor's car registration which had been lawfully blocked prepetition for the debtor's failure to pay a tax).

The exact question at issue in this case -- which is not specifically addressed by any of the cases noted above -- is whether the State of California has an affirmative duty to reinstate a contractor's license (which was suspended solely for failure to pay a tax) upon the contractor's bankruptcy filing. Cases have found that a State agency cannot condition the reinstatement of a license postpetition upon the payment in full of back taxes.[42] However, the parties have not cited, and the Court has not found, a case directly addressing the issue of whether the State has an affirmative duty to reinstate a contractor's license under these circumstances.

While not directly on point, <u>Grimes v. Hoschler</u>, 12 Cal.3d 305, 525 P.2d 65, 115 Cal.Rptr. 625 (Cal. 1974) does provide some insight. In <u>Grimes</u>, the California Supreme Court held that a earlier version of Cal. Bus. & Prof. Code § 7113.5 -- which allowed the suspension of a contractor's license if the contractor's "debts

---

[42] <u>See</u> discussion at page 30 and note 48 <u>supra</u>.

incurred as a contractor were discharged for less than their full
amount in a bankruptcy proceeding" and further forbade "the
reissuance of a revoked license until the amounts of the discharged
debts are paid in full" -- was invalid under the supremacy clause
of the United States Constitution in that it conflicted with the
provisions of the Bankruptcy Act. Just as the <u>Grimes</u> court held
that the discharge of debts in a bankruptcy proceeding cannot be a
basis for refusing to reinstate a contractor's license, by logical
extension, the Defendants cannot simply refuse to reinstate the
Debtor's license upon his bankruptcy filing. The sole basis for
the initial suspension of the Debtor's license was his non-payment
of a debt owed to the EDD. The practical effect of the Defendants
non-action is the same as if they were refusing to reinstate the
license solely because of the potential discharge of the debt to
the EDD in the Debtor's bankruptcy. In this regard, the facts
presented are analogous to those in the <u>Del Mission</u>, <u>Roberts</u>,
<u>Abrams</u>, <u>Henry</u> and <u>Jessamey</u> cases noted above, in which an
affirmative duty to undo prepetition actions was found. For these
reasons, under the circumstances presented, the Court finds that
the Defendants did have an affirmative duty to reinstate the
Debtor's contractor's license upon notice of his bankruptcy filing.

However, the Court's finding of an affirmative duty by the
Defendants to reinstate the Debtor's license does not end the
inquiry as to whether the Defendants willfully violated the
automatic stay. The other defenses raised by the Defendants must
first be analyzed.

## 2.   Police Powers under § 362(b)(4)

The next defense raised by the Defendants is the State's exercise of its "police powers."  The "police powers" exception to the automatic stay is recognized in Bankruptcy Code § 362(b)(4) which provides:

> The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—
>
> . . .
>
> (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

11 U.S.C. § 363(b)(4).  By its own language, the "police and regulatory powers" exception of 362(b)(4) does not include actions by the governmental unit to enforce a money judgment.  "This exception is intended to allow governmental units to sue a debtor 'to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law....'"  In re Dunbar, 235 B.R. 465, 471 (9th Cir. BAP 1999), aff'd, 245 F.3d 1058 (9th Cir. 2001), quoting, House and Senate Reports (Reform Act of 1978) (H.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 52 (1978)).  The police power exception must be narrowly construed and is only meant to apply to actions that further public health and safety.  In re PMI-DMV Real

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Estate Holdings, LLP, 240 B.R. 24, 31 (Bankr. D. Ariz. 1999).

The application of the police powers exception is not automatic. Dunbar, 235 B.R. at 471. Two tests have developed to determine whether a state agency's administrative action falls with the police powers exception -- the "pecuniary purpose" test and the "public policy" test. The Ninth Circuit Bankruptcy Appellate Panel has described these two tests as follows:

> Under the "pecuniary purpose" test, the court must determine whether the government action relates "primarily to the protection of the government's pecuniary interest in the debtors' property or to matters of public safety and welfare." In re Universal Life Church, Inc., 128 F.3d 1294, 1297 (9th Cir. 1997), cert. denied, 524 U.S. 952, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998) (citing N.L.R.B. v. Continental Hagen Corp., 932 F.2d 828, 833 (9th Cir. 1991)). "Indeed, most government actions which fall under [§ 362(b)(4)] have some pecuniary component, particularly those associated with fraud detection. This does not abrogate their police power function. Only if the action is pursued 'solely to advance a pecuniary interest of the governmental unit' will the automatic stay bar it." Universal Life Church, 128 F.3d at 1299 (9th Cir. 1997) (quoting Thomassen, 15 B.R. at 909).

> The "public policy" test distinguishes between those proceedings that effectuate public policy and those that adjudicate private rights. Universal Life, 128 F.3d at 1297; In re Charter First Mortg., Inc., 42 B.R. 380, 383 (Bankr. D. Or. 1984). Under the latter test, the court considers whether the administrative agency is exercising legislative, executive, or judicial functions. In re Poule, 91 B.R. 83, 86 (9th Cir. BAP 1988). "Where the agency's action affects only the parties immediately involved in the proceedings, it is exercising a judicial function and the debtor is entitled to the same protection from the automatic stay as if the proceeding were being conducted in a judicial form." Id.

Dunbar, 235 B.R. at 471.

The Debtor argues that the suspension of his contractor's license was triggered solely by his failure to pay prepetition employment taxes, and that the license would have been reinstated as soon as the Debtor paid those taxes. That being the case, per

the Debtor, there is no issue of public health or safety furthered by the suspension.  The Debtor argues that the collection of the taxes owed to the EDD is not an exercise of the State of California's police power and, thus, is subject to the automatic stay.

The Defendants insist that the CSLB is a government agency charged with the authority to qualify, license and discipline contractors in the State of California.[43]  After an individual is licensed with the State, that individual is required to comply with the laws of the State or risk discipline against his license. These disciplinary actions may include suspension, probation or outright revocation of the license.  The Defendants argue that the suspension of the Debtor's license was not solely to advance the pecuniary interest of the EDD.  Rather, per the Defendants, the CSLB suspended the license under Cal. Bus. & Prof. Code § 7145.5 as a means of regulating the business activities of contractors under the CSLB's licensure.

The Defendants note that, under the "pecuniary interest" test, only actions that are *solely* to advance a pecuniary interest of the governmental unit are outside the police powers exception to the automatic stay.  <u>Universal Life Church</u>, 128 F.3d at 1298-99.  The statute under which the Debtor's license was suspended does not provide for the actual collection of taxes, it simply allows the suspension of license of contractors who fail to comply with California State law.  Cal. Bus. & Prof. Code § 7145.5(a)(1) specifically provides as follows:

---

[43] Cal. Bus. & Prof. Code §§ 7065 and 7090.

1    The registrar may refuse to issue, reinstate, reactivate,
2    or renew a license or may suspend a license for the failure
     of a licensee to resolve all outstanding final liabilities,
3    which include taxes, additions to tax, penalties, interest,
     and any fees that may be assessed by the board, the
     Department of Industrial Relations, the Employment
4    Development Department, or the Franchise Tax Board.

5    (1) Until the debts covered by this section are satisfied,
     the qualifying person and any other personnel of record
6    named on a license that has been suspended under this
     section shall be prohibited from serving in any capacity
7    that is subject to licensure under this chapter, but shall
     be permitted to act in the capacity of a nonsupervising
8    bona fide employee.

9    Since the statute does not call for the actual collection of the

10   delinquent taxes -- but rather disciplinary actions against the

11   contractor -- the Defendants argue that the "pecuniary interest"

12   test is satisfied.

13        This argument by the Defendants may seem to have merit at first

14   glance, but it simply does not hold up upon closer examination.

15   The pecuniary purpose test distinguishes "between governmental

16   actions which are aimed at obtaining a pecuniary advantage for the

17   unit in question or its citizens, and those actions which represent

18   a direct application of the unit's police or regulatory powers."

19   In re Thomassen, 15, B.R. 907, 909 (9th Cir. BAP 1981).  In the

20   Debtor's case, the continued suspension of his contractor's license

21   was unquestionably for the purpose of "obtaining a pecuniary

22   advantage."  There can be no doubt that if the Debtor had paid the

23   taxes owing to the EDD, his license would have been reinstated

24   promptly by the CSLB.[44]  As soon as the EDD authorized the CSLB to

25

26        [44] Not until this matter went to trial did the CSLB become
27   aware of other "bad acts" by the Debtor, for which the CSLB
     ultimately sought and obtained revocation of the Debtor's
28   contractor's license.  At the time that the alleged violation of
     the automatic stay occurred, the sole basis upon which the

DECISION IN PART ON DEBTOR'S ACTION FOR
DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY          23

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

remove the suspension, the CSLB did so immediately without further inquiry. Further, the Notice of Suspension mailed by the CSLB to the Debtor on August 26, 2003 unequivocally states: "This suspension _will be_ lifted when you submit proof from the EMPLOYMENT DEVELOPMENT DEPARTMENT that the liability has been satisfied." Trial Exhibit F (emphasis added). Thus, the Debtor needed to do nothing more than pay the debt owing to the EDD. The EDD readily admits that one of its purposes in requiring review of the Debtor's plan before it would allow the suspension to be released was so that the EDD could ensure its claims would be paid under the plan.[45] There was no issue of public safety or welfare behind the continued suspension of the Debtor's license.[46] It was simply a matter of owing back taxes. It is clear, therefore, that the continued suspension of the Debtor's license was done solely to advance the pecuniary interests of the EDD. For that reason, the Defendants actions fail the "pecuniary interest" test for the police powers exception.

---

suspension of the Debtor's license was being maintained was the tax debt owed to the EDD.

[45] See Trial Brief in Opposition to Debtor's Amended Motion for Damages and Attorney's Fees, filed by the EDD on January 28, 2008, at 2:23-26. See also Deposition of Morris Hampton at 31:11-21, 33:2-18

[46] Compare In re Poule, 91 B.R. 83 (9th Cir. BAP 1988)("It is undisputed that the debtor . . . had committed serious violations of the Contractor's State License Law and ample grounds existed for revoking his license." The CSLB found that the debtor had abandoned a project without just excuse and had taken payment for materials not used on the project, compelling the customer to secure the services of other contractors to complete the job.) No such malfeasance on the part of the Debtor is alleged here.

The EDD also argues that the Defendants should prevail under the "public policy test" for determining whether the police powers exception applies. <u>In re Herr</u>, 28 B.R. 465, 468 (Bankr. D. Me. 1983). This approach distinguishes between proceedings that effectuate a public policy and those that adjudicate private rights. The EDD says that neither it nor the CSLB was attempting to adjudicate private rights in this case, therefore, this test is satisfied.

While it may be true that the Defendants were not pursuing private rights such as restitution for victims of violations of California State laws, that does not necessarily mean that the Defendants' actions meet the "public policy" test. The Ninth Circuit Bankruptcy Appellate Panel has provided some additional guidance with the respect to the "public policy" test:

> [W]here a state agency is attempting to punish a debtor for fraudulent conduct by assessing civil penalties, or where it is attempting to prevent future occurrences of fraud through injunctive relief, the action comes within the scope of section 362(b)(4).

<u>Poule</u>, 91 B.R. at 87. The purpose of the State of California's Contractor's Licensing Law is "to guard the public against the consequences of incompetent workmanship, imposition, and deception." <u>Poule</u>, 91 B.R. at 87, <u>citing</u> <u>Asjourian v. Araj</u>, 38 Cal.3d 276, 282, 211 Cal. Rptr. 703, 696 P.2d 95 (1985). Its purpose is not to ensure the payment of taxes owing to the EDD, which is how it was used against the Debtor in this case. In this case, there was no such incompetent, fraudulent or deceptive conduct underlying the suspension of the Debtor's license or the EDD's refusal to authorize the release of this suspension. Therefore, the actions of the Defendants also fail the "public

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  policy" test for the police powers exception.

2

3      **3. Debtor's Entitlement to Reinstatement Under State Statute**

4      The next argument raised by the Defendants, which is somewhat

5  related to their "no affirmative act" defense, is that they were

6  not required, under California State law, to reinstate the Debtor's

7  license.  In support of this argument, the EDD cites two Bankruptcy

8  Court decisions, one from the Eastern District of California and

9  one from the Eastern District of Arkansas -- <u>In re Feature Homes,</u>

10 <u>Inc.</u>, 116 B.R. 731 (Bankr. E.D. Cal. 1990) and <u>In re Kimsey</u>, 263

11 B.R. 244 (Bankr. E.D. Ark. 2001).  Both of these cases are easily

12 distinguishable from the facts at hand and provide little support

13 for the Defendants' argument.

14     The EDD cites <u>Feature Homes</u> for the proposition that a State's

15 refusal to reinstate the debtor's corporate status, which had been

16 suspended for failure to pay franchise taxes, did not constitute a

17 violation of the stay.  While this may have been the result in

18 <u>Feature Homes</u>, this particular proposition was, at best, <u>dicta</u> in a

19 footnote of that decision.  Every subsequent case that has

20 discussed <u>Feature Homes</u> has cited it for the proposition that a

21 corporation, whose powers are suspended, may nonetheless file

22 bankruptcy to wind up its affairs.[47]

23     In <u>Feature Homes</u>, a corporate debtor entered into a stock sale

24 agreement prepetition in which the debtor agreed to sell 100% of

25 its interest in a non-debtor company (the "Stock Sale Agreement").

26

27     [47]  <u>In re Realty Trust Corp.</u>, 1994 WL 202439 (9th Cir. 1994); <u>In</u>
28 <u>re Sacramento Mini Storage</u>, 1997 WL 206077 (9th Cir. 1997); <u>In re</u>
   <u>Kingsley</u>, 2000 WL 33679445 (Bankr. D.N.H. 2000).

1  Roughly one month after the Stock Sale Agreement was entered into,

2  but before it was finalized, the debtor's corporate status was

3  suspended for failure to pay taxes and/or file tax returns.  Three

4  days later, the debtor filed its voluntary Chapter 11 petition.

5  The Bankruptcy Court approved the debtor's assumption of the Stock

6  Sale Agreement.  The debtor then moved to compel the State to issue

7  a certificate of revival of the debtor's corporate status.  The

8  Bankruptcy Court denied the debtor's motion on the basis that "the

9  issuance of a certificate of revivor is completely unrelated and

10  irrelevant to successful closing of the Stock Sale Agreement."  Id.

11  at 733.

12  Feature Homes is not controlling on this Court and is factually

13  distinguishable on many levels.  The debtor in Feature Homes had

14  already agreed to the sale of its principal asset, before its

15  bankruptcy filing.  It was obvious, therefore, that the debtor

16  would not continue its business operations, and, therefore, did

17  not, in the Court's determination, need its corporate status

18  revived.  Further, the debtor in Feature Homes was a corporation,

19  not an individual.  Finally, Feature Homes did not arise in the

20  context of an action for damages under § 362(h); instead Feature

21  Homes found that the debtor's motion to compel reinstatement of the

22  debtor's corporate status under §§ 362(h) and 525(a) was

23  unnecessary and premature at that point in the case.  The Stock

24  Sale Agreement did not require the debtor's corporate status to be

25  current in Feature Homes, and the Bankruptcy Court could and did

26  approve the sale regardless of the debtor's corporate status.

27  While the Feature Homes court decided not to grant the

28  "extraordinary relief requested at this time", it left open the

possibility that the court might compel such a revivor in the
future "in the event that [the debtor] chooses to reactivate its
contracting business." Id. at 733.

Those are far from the facts presented in our current case.
Unlike the corporate debtor in Feature Homes, the Debtor
specifically advised the Defendants of his desire to reinstate his
contractor's license so that he could continue his business
operations postpetition. The Debtor here was certainly not selling
his assets and terminating his business operations, but rather was
seeking to reinstate his license and to increase those business
operations as part of his reorganization. For these reasons, the
dicta in Feature Homes is not applicable here.

The other case cited by the EDD is In re Kimsey, 263 B.R. 244
(Bankr. E.D. Ark. 2001). The EDD cites Kimsey for the proposition
that a City's refusal to reinstate a Chapter 13 debtor's driver's
license, which had been suspended prepetition as a result of the
debtor's traffic violations as well as for the failure to pay
resultant fines, did not violate the automatic stay. In Kimsey,
the debtor filed an adversary complaint to compel the reinstatement
of his driver's license. The debtor's confirmed plan provided for
the payment of all traffic fines, but the City of North Little Rock
did not reinstate the debtor's license. The debtor argued that the
City was in violation of § 362(a)(6) because the City refused to
reinstate his driver's license. The Kimsey court rejected this
argument and found:

> The evidence before the Court is that, prior to the filing
> of the chapter 13 case, the debtor's license was validly
> suspended for his failure to comply with the laws of the
> State of Arkansas and there is no requirement in the
> Bankruptcy Code, including section 362, that a governmental

1    unit reinstate the privilege to operate a motor vehicle
     simply because the individual later files a bankruptcy
2    case.  Thus, the City is not in violation of the automatic
     stay for refusing to lift the suspension of this driving
3    privileges.

4
Id. at 246.
5
6        While this language from Kimsey appears to present a more

7    compelling analogy for the Defendants, Kimsey too is not truly

8    applicable to the facts at hand because the payment of the fines

9    owed by the debtor in Kimsey would not have resulted in the

10   reinstatement of the debtor's license.  As Judge Montali noted in

11   the recent case of In re Thomas, 2007 WL 1079980 at *3 (Bankr. N.D.

12   Cal. 2007), in Kimsey:

13       [T]he debtor pleaded guilty to "driving without a driver's
         license, unsafe driving, failing to have proof of liability
14       insurance (and, in a subsequent year, failing to have
         liability insurance), leaving the scene of an accident,
15       driving on a suspended license, and failing to yield the
         right of way." Id. at 246. The debtor in Kimsey alleged
16       that the refusal to reinstate his license was for financial
         reasons, but the court found "no evidence" that the
17       government "has in fact taken any action to collect the
         debt." Id. Instead it found that "the City is not refusing
18       to reinstate the debtor's license because of his bankruptcy
         filing, but, rather, seeks to enforce the traffic [safety]
19       laws which permit termination of the driving privilege
         based upon violations of the law." Id. at 247.

20   Beyond owing fines to the City, the suspension of the debtor's

21   license in Kimsey was because of the debtor's serious traffic and

22   safety violations and, therefore, was an issue of public safety and

23   punishment.  Kimsey could not avoid the punishment of having his

24   license suspended simply by paying the fines or by filing

25   bankruptcy.

26       Those are not the facts surrounding the suspension of the

27   Debtor's contractor's license.  While Cal. Bus. & Prof. Code

28

§ 7145.5(a)(1) allows for the punishment of a contractor for the failure to pay all outstanding debts to the State of California, it also contemplates that this punishment only lasts "until the debts covered by this section are satisfied." Several courts have found that a requirement of payment in full of all back taxes as a condition to reinstatement of a license by a state agency is violative of 11 U.S.C. § 362.[48] The EDD's refusal to grant the CSLB's request to allow reinstatement of the license was an "affirmative act to collect a prepetition claim." There was no overriding issue of public safety relating to the suspension of the Debtor's contractor's license, as there was in the suspension of the debtor's driver's license in <u>Kimsey</u>. Therefore, the EDD's reliance on <u>Kimsey</u> is also misplaced.

### 4. CSLB Acting Under Direction of the EDD

The CSLB argues that it did not violate the automatic stay since it was simply complying with Cal. Bus. & Prof. Code § 7145.5. The CSLB insists that it could not legally remove the prepetition revocation of the Debtor's license until it was authorized by the EDD to do so. While this may be true, it does not address the fact that the CSLB delayed six days after receiving actual notice of the Debtor's bankruptcy filing before it even contacted the EDD seeking permission to reinstate the Debtor's license per his request.

---

[48] <u>Taxel v. California Employment Dev. Dep't</u> ( <u>In re Del Mission Ltd.</u>), 116 B.R. 734 (Bankr. S.D. Cal. 1990), <u>aff'd</u>, 130 B.R. 362, <u>aff'd</u>, 998 F.2d 756 (9th Cir.1993); <u>In re Nu-Process Brake Engineers, Inc.</u>, 119 B.R. 700, 702-03 (Bankr. E.D. Mo. 1990), <u>citing</u> <u>In re William Tell II, Inc.</u>, 38 B.R. 327 (N.D. Ill. 1983) and <u>In re Nashville White Trucks, Inc.</u>, 22 B.R. 578 (Bankr. M.D. Tenn. 1982).

Finally, as made clear at trial, the Defendants raise one final defense on the issue of whether they violated the automatic stay in refusing to reinstate the Debtor's license for twenty-four days. The Defendants argue that since the Debtor had continued to operate his business without his contractor's license for more than a year prior to filing, the Debtor did not "need" his license to effectuate his bankruptcy. The Court rejects the general proposition asserted by the Defendants that they may simply refuse to act as long as they determine, in their sole discretion, that the reinstatement of the Debtor's license is not necessary for his bankruptcy case. This is not their decision to make and not even a proper inquiry on their part. Further, it is preposterous for the Defendants -- particularly as agents of the State of California -- to argue in one breath that the Debtor violated California State licensing law by continuing to operate without a license for over a year, and then suggest that they did not have to reinstate the Debtor's license because he could simply continue to operate illegally without one.

The Defendants cite no authority in support of their argument that the Defendants could delay reinstating a debtor's license while they consider whether that debtor "needs" his license reinstated upon his bankruptcy filing. The only case that this Court has found which even remotely raises the issue of a debtor's "need" for authorization by a State agency is <u>Feature Homes</u>. In <u>Feature Homes</u>, the Bankruptcy Court found that the debtor had already sold all of its assets and the State's refusal to revive the debtor's corporate status had "little or no tangible impact upon this particular"

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Case: 05-52472 Doc# 85 Filed: 12/31/08    Entered: 12/31/08 10:57:35    Page 31 of
47

debtor since the debtor had "apparently not engaged in any contracting work for over three years, and [had] made no offer of proof that it in fact intends to pursue this occupation through a subsequent plan of reorganization." Id. at 733.  The Feature Homes decision then goes on to note:

> Of course, it may be that the Debtor will require a certificate of revivor in the event that it chooses to reactivate its contracting business under a confirmed plan of reorganization.  In the event the State refuses to voluntarily issue such a certificate following confirmation of the plan by this court, the issue will no doubt be ripe for reconsideration.

Id. at 733, n. 5.

The EDD does not contend that it relied on this language from Feature Homes in thinking it had the right to review the Debtor's Chapter 13 plan before deciding whether or not to allow the CSLB to reinstate the Debtor's license.  However, even if that contention had been made, any such reliance would have been misplaced.  This language from Feature Homes was buried in a footnote and is clearly dicta.  Further, even in this language from Feature Homes, it is the Court -- not the State agency -- deciding whether the debtor's corporate status was necessary for its bankruptcy case.

If the Defendants had any serious doubt about this issue, the Defendants could have easily sought expeditious guidance from the Court on the issue of the Debtor's "need" for his contractor's license, before reinstating the Debtor's license.[49]  Instead, the EDD asked for a copy of the Debtor's Chapter 13 plan.[50]  When the

---

[49] The Court has serious doubts that this lack of "need" -- even if proven -- would constitute an exception to Bankruptcy Code § 362(h).  However, the Defendants could have made those arguments to the Court prior to reinstating the license.

[50] Deposition of Morris Hampton at 32:5-7.

1    EDD received the plan, the EDD still refused to release the

2    suspension of the Debtor's license because it was concerned how the

3    EDD's claim would be treated under the plan.[51]  Although the

4    Defendants now say their concern was that the Debtor did not "need"

5    his contractor's license for his bankruptcy case, the actions of the

6    EDD clearly show its true motivation was the collection of the debt

7    owed by the Debtor to the EDD.  Only upon receiving a copy of the

8    Debtor's motion for a temporary restraining order did the EDD then

9    decide to release the hold on the Debtor's license.[52]  The EDD still

10   insists that it was not required to do so, but that it simply chose

11   to do so.

12       The Court finds that it would frustrate the very purposes of a

13   bankruptcy filing if State agencies were given the time and

14   discretion to determine, at their leisure, whether a bankruptcy

15   debtor "needs" a license reinstated to effectuate his or her

16   bankruptcy case.

17

18   **B.   Damages**

19       Upon a finding of willful violation of the automatic stay, an

20   award of actual damages, including costs and attorneys' fees, must

21   follow and is mandatory.  In re Taylor, 884 F.2d 478, 483 (9th Cir.

22   1989); In re Ramirez, 183 B.R. 583, 589 (9th Cir. BAP 1995); In re

23   Stainton, 139 B.R. 232, 235 (9th Cir. BAP 1992).  In appropriate

24   circumstances, § 362(h) also allows the recovery of punitive

25

26

27       [51]  Id. at 30:12-33:13.

28       [52]  Id. at 33:16-36:22

damages. In this case, the Debtor seeks both actual and punitive damages.

### 1. Actual Damages

"An award of actual damages under § 362(h) is intended to compensate a debtor for damages sustained as a result of a willful violation of the automatic stay." Henry, 328 B.R. at 668. Accord Roman, 283 B.R. at 9. The Ninth Circuit Bankruptcy Appellate Panel stated in Roman:

> Section 362(h) provides little guidance regarding the applicable standards for awarding actual damages. Nonetheless, most courts apply a reasonableness analysis. Section 362(h) "requires that the injured party be awarded the entire amount of actual damages *reasonably incurred* as a result of a violation of the automatic stay." [In re] Stainton, 139 B.R. [232,] 235 [9th Cir. BAP 1992] (emphasis added).

Roman, 283 B.R. at 11.

The Debtor has claimed that he lost certain profits as a result of the delay by the Defendants in reinstating his contractor's license. The Ninth Circuit has recognized that lost profits are "'necessarily an estimate' . . . and that their 'amount cannot be shown with mathematical precision.'"[53] In support of his alleged lost profits, the Debtor initially relied upon two contracts he had entered into shortly before filing (the "Leal and Tovar Contracts").[54] Had his license been timely restored, the Debtor alleged he would have realized a profit of $14,238 from those two

---

[53] Humetrix v. Gemplus, 268 F.3d 910, 919 (9th Cir. 2001) (internal citations omitted).

[54] Trial Exhibits P, Q and R.

Case: 05-05244   Doc# 85   Filed: 12/31/08   Entered: 12/31/08 10:57:35   Page 34 of 47

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  contracts.[55]  However, evidence presented a trial shows that these

2  contracts were cancelled and the deposits refunded prior to the

3  filing of the Debtor's bankruptcy petition.[56]  Therefore, the loss

4  of the Leal and Tovar Contracts cannot constitute actual damages

5  sustained by the Debtor.  At best, as argued by counsel for the

6  Debtor at trial, the Leal and Tovar Contracts may be some evidence

7  of the Debtor's ability to obtain installation jobs at about the

8  time of his bankruptcy filing.

9      At trial, the Debtor testified that prior to the suspension of

10  his license, in the Summer of 2003, he realized about $40,000 per

11  month in net profit from the installation portion of his business.

12  The Debtor provided absolutely no documentary evidence or business

13  records (e.g., books and records showing sales, profits, etc.) in

14  support of his testimony.  While this testimony may be some evidence

15  of a potential lost profit by the Debtor, it also fails to account

16  for the fact that the Debtor alleges he had not installed flooring

17  for over a year prior to his bankruptcy filing.  Clearly a business

18  that had not operated -- or at least should not have been operating

19  -- for over a year will require some start-up time before it will

20  again realize the same profits as it did at the height of its prior

21  operations.  At trial, the Debtor also submitted phone logs from

22  potential customers between October 8, 2004 and October 30, 2004.

23  While this provides some evidence of potential business, it is

24

25      [55]  Trial Exhibit R at ¶ 9.

26      [56]  Trial Exhibit P shows that the deposit from Christopher
27  Leal was returned on October 4, 2004.  Trial Exhibit Q shows the
    deposit from Oscar Tovar was refunded at 1:50 P.M. on
28  October 7, 2004.  The Debtor's Chapter 13 petition was filed
    shortly after 3:00 P.M. that same day.

1    speculative at best.

2         Finally, in his Post Trial Brief, the Debtor suggests that the

3    Court discharge the $12,385 claim of the EDD to "compensate the

4    debtor in part for the injury caused by the state's violation of the

5    automatic stay."[57]  This is not a measure of compensatory damages

6    and will not be awarded by the Court.

7         The Defendants raise several arguments against the alleged

8    damages sustained by the Debtor.

9         First, the Defendants submit that the Debtor has not produced

10   any evidence of actual damages for which he may recover.  While the

11   Court agrees that the Debtor cannot rely upon the specific values of

12   the Leal and Tovar Contracts as evidence of actual damages sustained

13   by the Debtor, those contacts do provide some limited evidence of

14   the Debtor's ability to obtain installation jobs near the time of

15   his bankruptcy filing.  In addition, the Debtor -- through the

16   course of the trial -- has submitted other evidence, albeit weak, in

17   support of his damage claim.

18        Second, the Defendants argue that "the debtor's damages would

19   appear to be minimal since he admits that he continued to operate

20   his business illegally as a suspended corporation, and without a

21   contractor's license for the 13½ months prior to filing the

22   bankruptcy petition."[58]  This is really a multi-faceted argument by

23   the Defendants.  First, the argument is that if the Debtor actually

24   continued his installation business notwithstanding the suspension

25

26        [57]  Plaintiff's Post Trial Brief at 6:1-3.

27        [58]  Trial Brief In Opposition to Debtor's Amended Motion for
28   Damages and Attorney's Fees, filed by the EDD on January 28, 2008,
     at 8:9-12.

of his license, then his business was not hurt by the fact he did not have a valid contractor's license. Second, if he was entering into installation contracts, they were illegal contracts pursuant to California state law -- since he did not have a valid contractor's license at the time -- and he cannot recover damages resulting from those contracts. Finally, since the Debtor was operating his business under the Statewide corporate name between 2001 and 2005, and the corporate status of Statewide was suspended on July 21, 2004, the Debtor was prohibited from legally operating his business as a corporation, even with his contractor's license reinstated.

Each part of this second defense fails. First, it is disingenuous of the Defendants to suggest that the Debtor's business operations were not hurt by the continued suspension of his license. Even assuming arguendo that the Debtor did operate the installation portion of his business without a valid contractor's license, he likely may not have gone full force with his advertising and other means of normal business development. Second, even if the Debtor is precluded by California state law from recovering from customers under contracts entered into without a valid contractor's license, the Debtor is not precluded, by this State law provision, from recovering damages against the CSLB and/or the EDD for violating the automatic stay. Finally, while Statewide's corporate status may have been suspended prior to the Debtor's bankruptcy filing -- thereby, preventing Statewide from lawfully conducting business -- the Debtor was operating, per the records of the CSLB, as a sole proprietor, not a corporation, under the business name "European

Hardwood Floors Design & Interiors" from April 23, 2003.[59]  The Leal and Tovar Contracts also specify the business name of European Hardwood Floor Design & Interiors.[60]  Therefore, at least per the records of the CSLB, the Debtor could have legally operated as a contractor if the CSLB had removed the suspension placed on his license.

Finally, the Defendants argue that, as a court of equity, this Court should not allow the Debtor to recover damages when he has acted with "unclean hands."[61]  The CSLB notes that the party seeking to recover damages from a court of equity must have "acted fairly and without fraud or deceit as to the controversy in issue."[62]  The Defendants argue that the Debtor lied on his initial contractor's application and subsequent filings with the CSLB, and would not have been issued a license and/or would have had his license revoked earlier if he had not made such material misrepresentations.  The Debtor, in turn, argues that the Court has "no need or jurisdiction to consider whether debtor should have been licensed."[63]  The Court agrees that the Debtor's past "bad acts" do not negate the fact that

_____

[59]  Trial Exhibits A, E, F, I, K

[60]  Trial Exhibits P and Q.  However, "Statewide Professional Services" -- without any "Inc." or other indication of possible corporate status -- is noted at the very bottom of the Tovar Contract in very small type.  Trial Exhibit Q.

[61]  Kendall-Jackson Winery v. Superior Court, 76 Cal.App.4th 970, 979 (Cal.App. 5 Dist. 1999), ESP Fidelity Corp. V. Department of Housing and Urban Development, 512 F.2d 887 (9th Cir. 1975).

[62]  Adler v. Fed. Republic of Nigeria, 219 F.3d 869, 877 (9th Cir. 2000).

[63]  Plaintiff's Post Trial Brief, filed on May 30, 2008, at 3:13.

1    the Defendants willfully violated the automatic stay.  On the other

2    hand, the Court cannot be blind to the fact that the Debtor may very

3    well not have been entitled to the license upon which he now sues.

4    Under the evidence presented, however, the Court need not and does

5    not reach this problematic issue of the equities presented by this

6    case -- at least not at this point.

7         The Court need not decide this final defense raised by the

8    Defendants because, after weighing all the evidence and arguments

9    presented, the Court finds that the Debtor has failed to

10   sufficiently establish any damages arising from the operation of his

11   installation business.  The Debtor has submitted three forms of

12   evidence is support of his damages claim: (1) the Leal and Tovar

13   Contracts, (2) his own testimony asserting he had averaged a net

14   profit of roughly $40,000 per month for the installation component

15   of his business before his license was suspended over a year prior

16   to his filing, and (3) phone logs of potential customer calls from

17   October 8, 2004 through October 30, 2004.  The Court finds each of

18   these items of evidence unpersuasive.

19        The Leal and Tovar Contracts are, at best, examples of the type

20   of contract the Debtor may have been able to obtain had his license

21   been reinstated.  However, the Leal and Tovar Contracts were both

22   entered into and cancelled just prior to the Debtor's bankruptcy.[64]

23   Customers solicited by the Debtor postpetition, may very well have

24   been much less receptive to a contractor operating while in

25   bankruptcy -- even with a reinstated contractor's license.  Just as

26   the Leal and Tovar customers may have searched the public records

27

28        [64]  No evidence was presented on the reasons why the Leal and
     Tovar Contracts were canceled prepetition.

and determined that the Debtor was not a licensed contractor, customers can also search this Court's records to determine if a contractor is a bankruptcy debtor. In any event, the Court finds that the Leal and Tovar Contracts are not persuasive evidence of any actual damages that the Debtor sustained from the Defendants' violation of the automatic stay for the twenty-four days involved here.

The Debtor's testimony about his past profits is also of little help. At trial, the Defendants submitted substantial evidence impeaching the Debtor's credibility. The Debtor could have submitted accounting records to support his testimony, but chose not do so. No documentary evidence, of any kind, was provided by the Debtor on the issue of his past income and expenses. The Court has no way of knowing what the Debtor's actual revenues were, either at the peak of his business or in the months immediately preceding his bankruptcy filing, when his license was suspended. Even if the $40,000 per month net profit testified by the Debtor is accurate, it is of limited relevance since it apparently represents the Debtor's revenues at the peak of his operations. At the time of his bankruptcy filing, the Debtor alleges he had not been in the installation business for over a year.

The telephone log of potential customers is not only tenuous and speculative evidence of damages, the testimony at trial demonstrates that it is not even necessarily indicative of potential installation projects -- the purpose for which the Debtor introduced the telephone log at trial. Many of the calls noted clearly relate

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

to potential material sales.[65]   The Debtor also noted that some of
the calls that appear to relate to installation inquiries might
actually relate to warranties for past installations.[66]   Therefore,
the Court finds that the telephone log is not sufficiently
persuasive evidence with respect to the losses the Debtor may have
sustained from being unable to service installation requests
postpetition.

Finally, all of the evidence presented by the Debtor must also
be considered in light of the fact that the delay caused by the
Defendants in the reinstatement of the Debtor's license lasted only
twenty-four days.   While this is not insignificant, it does limit
the time period for which the Debtor may claim operational damages.

Weighing all the evidence presented by the Debtor, the Court
finds that the Debtor has failed to meet his burden of proof.
Notwithstanding the violation of the automatic stay by the
Defendants, the Debtor has failed to prove he sustained any actual
damages to his business operations.

### 2.   Attorneys' Fees and Costs

However, the above analysis does not necessarily mean that the
Debtor cannot recover for his attorneys' fees and costs.   A debtor's
actual damages under 362(h) also explicitly includes costs and
attorneys' fees.   The Debtor argues that even if the actual damages
incurred by the debtor are only his or her attorneys' fees for

---

[65]   Trial Transcript, Vol. I, at 33:7-34:22.

[66]   Trial Transcript, Vol. I, at 63:23-65:1.

1  enforcing the terms of the automatic stay, an award of such

2  attorneys' fees to the debtor is mandatory.[67]

3  In <u>Roman</u>, the Ninth Circuit Bankruptcy Appellate Panel endorsed

4  the use of the principles used in Bankruptcy Code § 330 as a guide

5  for awarding attorneys' fees under Bankruptcy Code § 362(h).  The

6  <u>Roman</u> Panel also noted that there is a consensus in the case law

7  that, under § 362(h), the Bankruptcy Court must also examine whether

8  the debtor could have mitigated the attorney fee damages.

9  "Generally, in determining the appropriate amount of attorneys' fees

10  to award as a sanction, the court looks to two factors: '(1) what

11  expenses or costs resulted from the violation and (2) what portion

12  of those costs was reasonable, as opposed to the costs that could

13  have been mitigated.'" <u>Roman</u>, 283 B.R. at 12 (citations omitted).

14  The Debtor argues that the first factor in determining

15  reasonableness of the debtor's attorneys' fees is to ascertain

16  whether the creditor of the debtor created the injury.  <u>Roman</u>, 283

17  B.R. at 24.  On this issue, the Debtor notes that the creditor has

18  the burden both to establish administrative safeguards to prevent

19  stay violations and to restore the status quo by undoing them.  <u>Id</u>.

20  The Debtor also notes:

21      The State continues to this moment in denying that it had
        any obligation to honor the automatic stay.  EDD Post Trial
22      Brief, page 4, lines 2-24.  The record shows that the
        license was not reinstated until service of the complaint
23      and motion for a TRO were served on the State.  No more
        need be said about the need to bring this action and to
24      take it to trial in the face of governmental intransigence.

25  Plaintiff's Post Trial Reply Brief at 4:27-5:3.

26

27  _____

28  [67]  <u>In re Taylor</u>, 884 F.2d 478, 483 (9th Cir. 1989), <u>In re</u>
    <u>Walsh</u>, 219 B.R. 873 (9th Cir. BAP 1998).

There is one additional provision relating to the award of attorneys' fees which has not been addressed by the parties -- the Court's ability to award attorneys' fees and costs against a State agency. This issue is addressed by Bankruptcy Code § 106(a)(3), which provides:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

The problem with the Debtor's arguments in favor of an award of attorneys' fees and costs in this case is that no evidence has been submitted by the Debtor on this issue. Without such evidence, it is impossible for the Defendants or the Court to determine "(1) what expenses or costs resulted from the violation and (2) what portion of those costs was reasonable, as opposed to the costs that could have been mitigated.'" Roman, 283 B.R. at 12 (citations omitted). For this reason, to the extent that the Debtor still wishes the Court to consider an award of his attorneys' fees and costs, the Debtor's counsel is hereby directed to file with the Court, and serve on the Defendants a declaration containing a detailed accounting of her fees and costs.

A further potential complication for the Court's consideration of whether attorneys' fees and costs should be awarded is the issue of whether the equities would preclude an award of attorneys' fees

in this case.  The Court did not need to reach the question of the equities or "unclean hands" with respect to the Debtor's claim for actual damages arising from his business operations.  However, such an inquiry, may or may not be relevant with respect to the potential award of the Debtor's attorneys' fees and costs.  If the equities were to preclude the Debtor from recovering damages, does that necessarily preclude an award of attorneys' fees under 362(h)?  Even if the Debtor ultimately failed to prove any actual damages to his business operations, the Debtor still wanted his contractor's license reinstated.  Therefore, the adversary proceeding was nonetheless necessary under the circumstances.  There is no evidence that Debtor's counsel knew or should have known about the alleged "bad acts" which ultimately led to the revocation of the Debtor's contractor's license.  Therefore, is it even appropriate for the Court to consider the "bad acts" and the underlying license issues in determining the reasonableness of the attorneys' fees and costs incurred, and whether those fees and costs could have been mitigated?  On the other hand, the Debtor acknowledged under cross-examination at trial that he chose not to answer truthfully on the question regarding his criminal history on his application for a contractor's license.  Trial Transcript, Vol. II, at 59:7-64:12.  *Must* the Court consider such factors since an award of attorneys' fees and costs is still an award to the Debtor, even if indirectly?

The parties must be given a full opportunity to address these issues, and any other they may wish to raise after reviewing the Debtor's attorneys' fees and costs.  For this reason, the Court cannot rule on the issue of attorneys' fees and costs at this time.

### 3.   Punitive Damages

The Debtor also seeks punitive damages against the Defendants. Such damages against governmental units are expressly prohibited under 11 U.S.C. § 106(a)(3), quoted above.   For this reason, the Debtor's request for punitive damages is denied.   Further, even if such punitive damages were available, they are not appropriate under the facts of this case.

III.

<u>CONCLUSION</u>

For the above stated reasons, the Court finds that the Defendants, collectively, violated the automatic stay by failing to reinstate timely the Debtor's contractor's license upon receiving actual notice of his bankruptcy filing and request for reinstatement.   However, the Debtor has failed to prove any actual damages arising from the operation of his business, and, therefore, shall not be awarded any damages on that basis.   The Court also denies the Debtor's request for punitive damages.

The Court cannot, at this time, determine whether the Debtor should be awarded any attorneys' fees or costs as actual damages. The Court suggests that the parties may want to discuss settlement of this remaining issue at this juncture.   If no settlement can be reached and the Debtor still wishes to pursue an award of attorneys' fees and costs, the Debtor's counsel must file and serve a declaration with support documentation that sets forth all of her fees and costs in detail, within sixty days of the entry of this Partial Decision.   The Debtor should concurrently file and serve a Memorandum of Points and Authorities addressing the issues noted

above by the Court, and setting forth such further arguments as the Debtor would like the Court to consider. The Defendants shall have seventeen days from the date of service of the Debtor's papers to file their responses. The deadline for the Debtor's reply shall be ten days after the deadline for the Defendants' responses. No further pleadings should be submitted. The Court will take the sole issue of attorneys' fees and costs under submission upon the filing of the Debtor's reply. The Court will schedule oral argument only if the Court determines that such argument would likely be of assistance to the Court.

If the Debtor chooses not to further pursue an award of attorneys' fees and costs, after sixty days from the entry of this Partial Decision, the Court will issue an order consistent with this Partial Decision but also denying the Debtor's request for attorneys' fees.

***END OF DECISION***

1    <u>Court Service List</u>

2    Frank Bertuccio
     1080 Terra Bella #C
3    Mountain View, CA 94040

4    Cathleen Cooper Moran, Esq.
     Moran Law Group, Inc.
5    1674 N Shoreline Blvd. #140
     Mountain View, CA 94041-1375

6
     Maretta D. Ward, Esq.
7    Deputy Attorney General
     California Department of Justice
8    455 Golden Gate #11000
     San Francisco, CA 94102

9
     Marguerite C. Stricklin, Esq.
10   Deputy Attorney General
     Office of the Attorney General
11   P.O. Box 70550
     Oakland, CA 94612-0550

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28